UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JESSICA MULLEN,<br><br>    Plaintiff,<br><br>    v.<br><br>NEW BALANCE ATHLETICS, INC.,<br><br>    Defendant. | Civil Action No. |

**COMPLAINT**
**JURY TRIAL REQUESTED**
**INJUNCTIVE RELIEF REQUESTED**

The Plaintiff, Jessica Mullen ("Ms. Mullen"), by and through undersigned counsel, complains against the Defendant, New Balance Athletics, Inc. ("New Balance"), as follows:

JURISDICTION AND PARTIES

1. This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

2. Ms. Mullen is a United States citizen residing in Canaan, Maine.

3. New Balance is a Massachusetts corporation that operates manufacturing facilities in Skowhegan, Norridgewock and Oxford, Maine.

4. New Balance had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

5. This Court has subject matter jurisdiction over Ms. Mullen's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

6. On or about September 8, 2016, Ms. Mullen filed a timely Charge/Complaint of Discrimination against New Balance alleging unlawful disability discrimination and retaliation

1

with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

7. On or about April 19, 2017, the EEOC issued a Notice of Right to Sue with respect to Ms. Mullen's federal law claims.

8. On or about April 25, 2017, the MHRC issued a Notice of Right to Sue with respect to Ms. Mullen's state law claims.

9. Ms. Mullen has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

## JURY TRIAL REQUESTED

10. Ms. Mullen requests a trial by jury for all claims and issues for which a jury is permitted.

## SUMMARY

11. On July 10, 2015, New Balance violated Ms. Mullen's rights under the MHRA and the ADA by denying her a reasonable accommodation and by terminating her employment because of disability discrimination and in retaliation for her request and need for reasonable accommodation.

## FACTUAL ALLEGATIONS

12. Ms. Mullen was 35 years old in 2015.

13. Ms. Mullen developed cysts on her ovaries and had both ovaries removed, one after the other. In the spring of 2015, Ms. Mullen had her uterus removed, also due to cysts.

14. After Ms. Mullen had her ovaries and uterus removed, she was substantially limited in the major life activity of reproduction.

15. During her employment with New Balance, Ms. Mullen had hot flashes from early menopause but had no other limitation on her ability to work.

16. Ms. Mullen had interviews for a job at New Balance on about May 29 and June 1, 2015. She took a wash cloth with her to the interviews to wipe her face when she had hot flashes.

17. Ms. Mullen disclosed that she had occasional hot flashes when one of the interviewers asked if there were any issues with Ms. Mullen performing the job. When the interviewer remarked, "You're so young," Ms. Mullen disclosed that she had recently had a hysterectomy.

18. Ms. Mullen worked for New Balance for about three weeks as a stitcher in training at the Learning Center in Norridgewock, Maine.

19. Ms. Mullen's trainer's name was Julie Prentiss.

20. Ms. Prentiss trained Ms. Mullen and Sheri [LNU], another woman who was hired at the same time as Ms. Mullen.

21. Ms. Mullen proceeded along through training at the same rate as Sheri, her peer.

22. June 22 through 26, 2015 was Ms. Mullen's first week of employment.

23. During that week, Ms. Mullen learned to identify and operate machines and various stitches. She also learned safety protocols and other rules and procedures.

24. During the second week, June 29 through July 3, 2015, the factory was shut down and no one worked.

25. Ms. Mullen continued to train during the week of July 6 through 10, 2015 which turned out to be her third and final week of employment.

26. Ms. Mullen's progress was well within normal expectations for a new hire.

27. At about 11 AM on Friday, July 10, 2015, Ms. Prentiss realized that she was training Ms. Mullen on the wrong job. Ms. Prentiss was showing Ms. Mullen how to do the 1st collar when she was supposed to be training Ms. Mullen on the 2nd collar.

28. Ms. Prentiss went back to her desk to look at the paperwork and then returned to Ms. Mullen's station to explain the mistake and apologize. Ms. Mullen told Ms. Prentiss there was no need to apologize, that she was getting paid to work and was learning to stitch.

29. Ms. Prentiss showed Ms. Mullen how to do the 2nd collar and then had her practice the stitch without thread.

30. Ms. Mullen learned the new task quickly and went over to show Ms. Prentiss her work. Ms. Prentiss praised Ms. Mullen and told her she did a really good job. Ms. Prentiss had Ms. Mullen thread the machine and do the stitch for real.

31. Ms. Mullen worked on the stitch for a little while before Ms. Prentiss came back to her station to inspect her work. Ms. Prentiss told Ms. Mullen she was doing a good job then showed Ms. Mullen another stitch.

32. Ms. Prentiss showed Ms. Mullen where to place her hands on the shoe and feed it into the machine. As Ms. Mullen started to stitch with Ms. Prentiss standing by her side, Ms. Prentiss began to get irritated with Ms. Mullen. Ms. Prentiss grabbed the shoe from Ms. Mullen and snapped at her to move over so that Ms. Prentiss could demonstrate the stitch again.

33. Ms. Prentiss's conduct was upsetting to Ms. Mullen and triggered a hot flash. Ms. Mullen's safety glasses fogged up and she couldn't see.

34. Ms. Mullen stepped back away from the machine and lifted her safety glasses to wipe her eyes and glasses. Ms. Prentiss snapped at Ms. Mullen again, something to the effect of, "What did I tell you about your safety glasses, they need to be on your face at all times!" Ms. Mullen told Ms. Prentiss that she was having a hot flash and needed to wipe her face.

35. Ms. Prentiss turned back to the machine and continued to stitch. Ms. Mullen began to cry because it bothered her to be yelled at by Ms. Prentiss.

36. Ms. Prentiss asked Ms. Mullen, "Are you overwhelmed?" Ms. Mullen told Ms. Prentiss that she just had a hot flash.

37. Ms. Prentiss told Ms. Mullen to go into the cafeteria and that she (Ms. Prentiss) needed to report this to Human Resources ("HR"). Ms. Prentiss left and when she came back, she told Ms. Mullen they wanted to see her in the Human Resources Department (HR).

38. Ms. Mullen went to HR and met with Rachel Merry or Frances Fisher. [Note: Ms. Mullen does not know the name of the HR representative she initially met with. According to Defendant, Ms. Mullen met with two HR employees that day, Rachel Merry or Frances Fisher. Presumably, Ms. Mullen met with one of them before lunch.]

39. The HR representative asked Ms. Mullen if she had any "outbursts." Ms. Mullen said no, what do you mean? She said, "Let's get Julie in here." She called for Ms. Prentiss but she was on lunch break.

40. Ms. Mullen was sent out to take her break and asked to come back after lunch.

41. Ms. Mullen punched out, took a break, and punched back in.

42. When Ms. Mullen came back, the HR representative told Ms. Mullen that she asked someone from HR in Skowhegan to come to the Norridgewock plant. Ms. Mullen was told to sit and wait for the HR person from Skowhegan to arrive.

43. Ms. Mullen waited another 40 minutes and was then called into a meeting with HR from Norridgewock and Skowhegan. Presumably, their names are Rachel Merry or Frances Fisher.

44. Ms. Mullen was asked the same question about having an "outburst." Ms. Mullen told the HR representatives that she had started crying because Ms. Prentiss yelled at her for

having a hot flash and it hurt her feelings. Ms. Mullen told them that if she had just been allowed to go to the bathroom and wash her face, she could have gone back to work.

45. One of them asked Ms. Mullen, "Do you think maybe you started this job too soon?" referring to her hysterectomy. Ms. Mullen said no, not at all. She was glad to have a good job. She said she wanted to work there for the rest of her life. She was learning how to stitch and was not upset that Ms. Prentiss had her change from 1st to 2nd collar. Ms. Mullen said that perhaps she should have gone into the bathroom to wipe her face when the hot flash started. Ms. Mullen was crying during this discussion with the HR representatives.

46. One of the HR representatives told Ms. Mullen, "Well, here's your check." Ms. Mullen was shocked and asked, "You're letting me go?" The HR representative said, "We don't think it is a good fit. We can't have someone get that emotional."

47. One of the HR representatives pushed a form over to Ms. Mullen and asked her to sign it. There was a place on the form where she was supposed to fill in a reason. Ms. Mullen asked, "What am I supposed to write?" The HR representative told Ms. Mullen to write anything she wanted. Ms. Mullen wrote, "Emotional issues" because that's what she was told was the reason New Balance was letting her go. Ms. Mullen was told to get her stuff and one of the HR representatives walked her out.

48. Counsel for Ms. Mullen obtained a copy of Ms. Mullen's personnel file from New Balance after she was fired. The file contained notes that were apparently made by someone in HR about her termination.

49. Ms. Mullen agrees with some of the notes but not others.

50. Ms. Mullen agrees, for example, that her hysterectomy was discussed when she was being fired as well as her hot flashes and emotional changes related to her hysterectomy. Ms.

Mullen agrees that a HR representative told her, "Maybe this is not the right time for you at New Balance." Ms. Mullen also agrees that she [Ms. Mullen] said, "So what does this mean am I getting let go?" because Ms. Mullen did not quit voluntarily.

51. Ms. Mullen strongly disagrees that she had a bad attitude or that she struggled with quality.

52. Counsel for Ms. Mullen also obtained a letter from New Balance stating the reasons for her termination. In that letter, New Balance said that the reason for Ms. Mullen's termination is that she resigned, which is false and misleading. It is true that Ms. Mullen complied with the HR representative's request that she sign the resignation form presented at the termination meeting. However, Ms. Mullen was repeatedly told that she was being separated from her employment because, according to HR, "this is not the right time for you here at New Balance." Ms. Mullen was told that she was being separated from her job and so she did not have a choice.

53. New Balance alleges that Ms. Mullen quit and Ms. Mullen had performance and attitude issues, claims that are false and pretextual.

54. *Termination vs. resignation*: Ms. Mullen did not resign voluntarily. She was told to resign by Human Resources representatives Rachel Merry and Frances Fisher. Ms. Mullen asked if she was being terminated. In response, Ms. Merry repeatedly told Ms. Mullen, "maybe this isn't the right time for you at New Balance," and passed her a resignation form. If Ms. Mullen wanted to resign, she could have simply punched out, left the facility, and not returned.

55. New Balance would not raise issues about Jessica's performance and attitude if the company thought that a neutral fact finder would conclude that Jessica quit voluntarily.

56. *Alleged performance and attitude issues*: Ms. Mullen was never informed about any performance issues during her employment, not by her trainer or anyone else. Ms. Mullen was always told that she was doing a great job and was quickly moving on to the next part of the training process. During the first week of her training, Ms. Mullen was given papers to study about the equipment and safety and she had to take quizzes on them daily. Ms. Mullen signed her name and dated them. Ms. Mullen always passed and moved on with her training.

57. New Balance alleges that Ms. Mullen did not ask for help on June 23, 2015 during her second week of training which is false and misleading. The trainer, Ms. Prentiss, was sitting at her desk talking with a couple of her colleagues. Ms. Mullen waited a few minutes and then went over, apologized for interrupting, and asked Ms. Prentiss if she could come to Ms. Mullen's station when she was done. Ms. Prentiss told Ms. Mullen that she should ask for help any time she needed it.

58. New Balance also alleges that Ms. Mullen told Ms. Prentiss that she cried every day at her former job because the owners weren't nice which is false and misleading. During Ms. Mullen's first week on the job at New Balance, a group of trainees and trainers were talking about their previous jobs. Ms. Mullen mentioned a previous job that she enjoyed except for the owners, who were unprofessional; in fact they were mean and mistreated their employees. Ms. Mullen talked about coming home after work and when her mother asked about her one day, she would start crying. This conversation had nothing to do with her experience working at New Balance, which was going fine.

59. Ms. Mullen was asked to sign a daily tracking sheet at the beginning of the week when the form was blank. She never saw information and notes made by Ms. Prentiss while she was employed. If she had seen Ms. Prentiss's notes, she would have disagreed with several

comments. For example, Ms. Mullen disagrees with the note on the second page of the tracking sheet that reads, "6-25 - asked if she doesn't make it @ stitching what will happen…" That was a general question that Ms. Mullen and the other trainee, Sheri, both asked during their second week of training. Ms. Mullen also disputes that she was very frustrated with the Bonis machine and said she couldn't do it. Ms. Prentiss did not tell Ms. Mullen to take a breath and walk and Ms. Mullen was never late from break.

60. Ms. Mullen disagrees with the comment dated 7/7 on page two of the daily tracking sheet. Ms. Mullen did not give Ms. Prentiss "attitude" when Ms. Prentiss told Ms. Mullen she was leaving to go to Skowhegan. Ms. Mullen said something sarcastic and funny and when she realized that Ms. Prentiss took it wrong, told Ms. Prentiss that she was kidding. Ms. Prentiss told Ms. Mullen that she knew Ms. Mullen was kidding but someone else might not think so. Ms. Mullen said she was sorry, and Ms. Prentiss accepted her apology.

61. Ms. Mullen agrees that Ms. Prentiss advised her to bring another pair of shoes to work if her feet were hurting. Unfortunately, Ms. Mullen only had one pair of sneakers.

62. New Balance takes the position that Ms. Mullen found her position very overwhelming and stressful, but that is not true. Ms. Mullen enjoyed her job and her co-workers and was on track with the learning process for becoming a stitcher.

63. Ms. Mullen has a disability, a record of disability, and was regarded as disabled by New Balance as those terms are defined by the MHRA and ADA.

64. Ms. Mullen is a qualified individual with a disability in that she was able to perform the essential functions of the stitcher job as a trainee, with or without accommodation.

65. It was obvious to New Balance that Ms. Mullen needed reasonable accommodation for her disability including the ability to use a wash cloth to wipe her face and

glasses after a hot flash and forbearance when she became upset and cried about things that would not normally upset her.

66. Ms. Mullen was terminated because of her disability and/or symptoms of her disability including her hot flashes and emotional changes related to her hysterectomy.

67. New Balance failed to provide Ms. Mullen with reasonable accommodation and terminated because she needed reasonable accommodations.

68. New Balance asserts that Ms. Mullen resigned voluntarily which is untrue.

69. New Balance told Ms. Mullen to resign because there was no basis for terminating her. Ms. Mullen was learning the job at the same pace and with the same level of success as Sheri and other new hires.

70. Ms. Mullen did not have a performance or an attitude problem.

71. New Balance's stated reasons for Ms. Mullen's separation from employment are false and pretextual.

72. New Balance terminated Ms. Mullen because of disability discrimination.

73. New Balance retaliated against Ms. Mullen for exercising her right to request reasonable accommodation under the ADA and MHRA.

74. New Balance retaliated against Ms. Mullen for needing reasonable accommodations under the ADA and MHRA.

75. The conduct of Ms. Prentiss, Ms. Merry and Ms. Fisher toward Ms. Mullen evidences their discriminatory and retaliatory animus.

76. The temporal proximity between Ms. Mullen's request and need for reasonable accommodation is evidence of a causal connection.

77. New Balance knowingly and willfully violated Ms. Mullen's rights under the ADA and the MHRA.

78. New Balance unlawfully discriminated and retaliated against Ms. Mullen with malice or reckless indifference to her rights.

79. As a result of New Balance's unlawful discrimination and retaliation against Ms. Mullen, she has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

80. Ms. Mullen has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and she will continue to suffer irreparable injury from her treatment by New Balance unless and until New Balance is enjoined by this court.

## COUNT I: MHRA
## UNLAWFUL DISCRIMINATION

81. Paragraphs 1-80 are incorporated by reference.

82. Defendant's conduct constitutes unlawful disability discrimination against Plaintiff in violation of the MHRA.

## COUNT II: MHRA
## FAILURE TO ACCOMMODATE

83. Paragraphs 1-82 are incorporated by reference

84. Defendant violated the MHRA by failing to provide Plaintiff with reasonable accommodations for her disability.

## COUNT III: MHRA
## UNLAWFUL RETALIATION

85. Paragraphs 1-84 are incorporated by reference.

86. Defendant violated the MHRA by retaliating against Plaintiff because she needed a reasonable accommodation for her disability.

## COUNT IV: ADA
## UNLAWFUL DISCRIMINATION

87.     Paragraphs 1-86 are incorporated by reference.

88.     Defendant's conduct constitutes unlawful discrimination against Plaintiff in violation of the ADA.

## COUNT V: ADA
## FAILURE TO ACCOMMODATE

89.     Paragraphs 1-88 are incorporated by reference.

90.     Defendant violated the ADA by failing to provide Plaintiff with reasonable accommodation for her disabilities.

## COUNT VI: ADA
## UNLAWFUL RETALIATION

91.     Paragraphs 1-90 are incorporated by reference

92.     Defendant violated the ADA by retaliating against Plaintiff because she required and used reasonable accommodations for her disability.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.      Declare the conduct engaged in by Defendant to be in violation of her rights;

B.      Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C.      Order Defendant to employ Plaintiff in her former position and/or award front pay for future lost earnings to Plaintiff;

D.      Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.      Award equitable-relief for back pay, benefits and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award nominal damages;

I. Award attorney's fees, including legal expenses, and costs;

J. Award prejudgment interest;

K. Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

L. Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

M. Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N. Require that Defendant train all management level employees on the protections afforded by the ADA and the MHRA;

O. Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of disability and retaliation; and

P. Grant to Plaintiff such other and further relief as may be just and proper.

Dated: May 30, 2017
/s/ Chad T. Hansen
chansen@maineemployeerights.com

/s/ Peter Thompson
pthompson@maineemployeerights.com

Attorneys for the Plaintiff

MAINE EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343