# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| JESSICA MULLEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 1:17-cv-194-NT |
| | ) |
| NEW BALANCE ATHLETICS, INC., | ) |
| | ) |
| Defendant. | ) |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

In this employment action, Plaintiff Jessica Mullen alleges that Defendant New Balance Athletics, Inc. ("**New Balance**") discriminated against her because of her disability and retaliated against her for requesting reasonable accommodations for that disability in violation of the Maine Human Rights Act ("**MHRA**") and the Americans with Disabilities Act ("**ADA**"). Compl. (ECF No. 1). Before me are the Defendant's motion for summary judgment (ECF No. 34), and the Plaintiff's motion for partial summary judgment on the Defendant's affirmative defense of failure to mitigate damages. (ECF No. 40.) For the reasons that follow, both motions are **DENIED**.

## BACKGROUND[1]

In 2004, Mullen underwent a tubal ligation—a medical sterilization procedure. CSMF ¶ 26, 98. At the time, Mullen did not want to have more children, but she had

---

[1] Unless otherwise indicated, the following background is drawn from the undisputed facts set out in the parties' Consolidated Statement of Material Facts ("**CSMF**") (ECF No. 46), supplemented by materials in the record. For this purpose, in accordance with the Local Rules of this Court, I deem to be undisputed all statements of fact that were supported by a record citation and for which the

not ruled out having another child at some point in the future. CSMF ¶ 99. The doctor who performed the tubal ligation informed Mullen that she could potentially have the procedure reversed and become pregnant. CSMF ¶ 100.

Years later, Mullen began to experience episodes of extreme pain caused by ovarian cysts. CSMF ¶¶ 75-76. In June of 2013, Mullen had her right ovary and fallopian tube surgically removed (a procedure referred to as a right salpingo-oophoretomy) in an effort to treat her cysts. CSMF ¶ 75. The cysts returned, and Mullen's pain became incapacitating. CSMF ¶¶ 78-83. Eventually, on April 1, 2015, Mullen opted to undergo a total hysterectomy and left salpingo-oophorectomy (the removal of her uterus and her left ovary and fallopian tube) to eliminate the cysts. CSMF ¶¶ 88-89. Before her surgery, Mullen's surgeon advised her that the procedure was permanent, Ex. 7 at 1 (ECF No. 31-6), and that it would render her incapable of conceiving or bearing children. Ex. G at 82:10-22 (ECF No. 39-7); *see* CSMF ¶ 96. The doctor also explained that the procedure would impact Mullen's endocrine system, because ovaries are responsible for generating estrogen and other hormones. CSMF ¶ 91. The doctor told Mullen that after her remaining ovary was removed she "w[ould] be in menopause" and would experience symptoms including hot flashes,

---

responsive denial or qualification was not supported by a record citation. D. Me. Loc. R. 56(b)-(f). I note that in many instances, the Defendant has attempted to qualify the Plaintiff's properly-supported statements of fact by asserting that the Defendant has "no knowledge" of the fact asserted. *See, e.g.*, CSMF ¶¶ 76-95. In other instances, the Defendant has denied or qualified the Plaintiff's factual statements and offered a contrary statement of fact without a supporting record citation. *See, e.g.*, CSMF ¶¶ 175-177. These efforts do not satisfy the Local Rules. *See Burnett v. Ocean Props., Ltd.*, 327 F. Supp. 3d 198, 215 n.54 (D. Me. 2018) (under Local Rules, assertion that party opposing summary judgment "lack[ed] sufficient information to admit or deny" a statement of fact fails to properly controvert that statement of fact).

becoming emotionally overwhelmed, and crying. CSMF ¶ 91, 93; Ex. 7 at 1. Mullen began to experience the symptoms her surgeon had described not long thereafter. CSMF ¶ 94.

Less than two months after her surgery, Mullen's doctor cleared her to work without any restrictions and, on May 18, 2015, Mullen applied for a position as a stitcher with New Balance. CSMF ¶¶ 14, 22. She was hired. *See* CSMF ¶ 37.[2]

New Balance manufactures athletic footwear at three facilities in Maine, located in Skowhegan, Norridgewock, and Norway. CSMF ¶ 1. New Balance requires new employees like Mullen to undergo a training program at its Norridgewock facility. CSMF ¶¶ 34, 36. Mullen began her training on June 23, 2015, under the instruction of trainer Julie Prentiss. CSMF ¶¶ 37-38. At some point during the beginning of Mullen's training period, Mullen mentioned to Prentiss that she had recently had a hysterectomy. CSMF ¶ 40.

Mullen had difficulty mastering one of the stitching machines. CSMF ¶ 50. On the morning of July 10, 2015, Mullen was working with that machine when she had an abrupt exchange with Prentiss. *See* CSMF ¶¶ 53, 103-104. The parties dispute the exact nature of the exchange, but it is undisputed that Mullen became very upset and began to cry.[3] CSMF ¶ 54.

---

[2] Before beginning work at New Balance, Mullen had not been steadily employed since June of 2011. CSMF ¶ 15.

[3] During her deposition, Prentiss testified that Mullen became frustrated with the task at hand, threw down the shoe she was working on, and began to cry. Ex. 10 at 34:5-20 (ECF No. 32-3). Mullen claims that Prentiss became impatient with Mullen, grabbed the shoe Mullen was working on, and pushed Mullen away from the machine. *See* CSMF ¶ 53. According to Mullen, this upset her and triggered a hot flash that fogged up her safety glasses so that she could not see. *See* CSMF ¶ 53. Mullen

3

Prentiss contacted Norridgewock human resources manager Frances Fisher and brought Mullen to one of the facility's cafeterias to wait. CSMF ¶ 55. Prentiss explained to Fisher what had happened, informing Fisher that Mullen had an "outburst." CSMF ¶¶ 56, 109. Fisher talked with Mullen briefly, and then, because Mullen had been hired to work at New Balance's Skowhegan facility, Fisher called in Skowhegan human resources manager Rachel Merry. CSMF ¶¶ 57, 59. When Merry arrived, Fisher and Prentiss filled her in about what had happened with Mullen, and Prentiss told the human resources mangers that Mullen had undergone a hysterectomy three months prior that affected her emotions. CSMF ¶¶ 61, 128.

Merry and Fisher then spoke with Mullen about her purported outburst. CSMF ¶ 125. The parties' witnesses have offered conflicting testimony about that conversation. However, the following points are not in dispute:

- Mullen told Merry and Fisher that she had undergone a hysterectomy, that she was having hot flashes, and that she was working with her doctor on medications because her emotions were "all over the place." CSMF ¶¶ 126, 129; *see* CSMF ¶ 63.

- Merry told Mullen that "maybe this isn't the right time for you at New Balance because what you explained about the working environment and instructions from your trainer should not have set you off as it did." CSMF ¶ 133.

- Mullen asked Merry: "What does this mean? Am I being let go?" CSMF ¶ 135.

- Merry responded that "that is a decision that I want us to reach together." CSMF ¶ 136. She added that "seeing you sitting here in the condition you are in, I still feel that this is not the right time for you here at New Balance." CSMF ¶ 138.

- Mullen cried at times during the exchange. CSMF ¶ 62.

---

has further testified that when she stepped away from the machine to lift her glasses and wipe her eyes, Prentiss snapped at her "you need to keep them on your face." CSMF ¶¶ 103-104.

4

- The conversation ended with Mullen filling out and signing a resignation form. CSMF ¶ 64. On the form, Mullen indicated that the reason for her resignation was "emotional reasons." CSMF ¶ 156.

Mullen has testified to the following additional facts, all of which the Defendant denies:

- Mullen told Merry and Fisher that her doctor told her that her hysterectomy would cause her to go into early menopause over the next years. CSMF ¶ 126.

- After informing Merry and Fisher about her hysterectomy and its impact on her mood, Mullen told Merry and Fisher that all she had to do was "just wipe my face and go back to work." CSMF ¶¶ 129-130; Ex. 6 at 63:4-20, 77:24-78:7.

- Merry asked Mullen whether she had started the job too soon after her hysterectomy. CSMF ¶ 140.

- When Mullen responded that she did not believe that was the case, Merry stated that "we think it is too soon," and "we don't think this is a good fit for you." CSMF ¶¶ 141-143.

- Merry then said, "I don't think that we should have somebody working here that gets that emotional." CSMF ¶ 145.

- Mullen responded that she did not want to quit or to be fired, and that all she wanted to do was go back to work. CSMF ¶ 146.

- Merry repeatedly insisted that Mullen needed to fill out the resignation form, and Mullen demurred, saying that she needed the job and that she did not want to quit. After multiple rounds of this exchange, Mullen completed the resignation form. CSMF ¶¶ 147-155.

After Mullen left New Balance, she did not secure new employment until April of 2016, when she began working as a flagger for Northeast Safety. CSMF ¶¶ 184-186. Mullen and her boyfriend both started work at Northeast Safety on the same day. CSMF ¶ 201. During the nine months between her departure from New Balance and her hire at Northeast Safety, Mullen applied to many potential employers. CSMF ¶ 178. From July 2015 until April 2016, she consistently reviewed newspapers and

the internet for open positions and applied to any position that she believed might pay $ 10 per hour or more. CSMF ¶¶ 179-180.

At Northeast Safety, Mullen typically works 30 to 40 hours per week and is paid $ 11.50 per hour. CSMF ¶¶ 188, 190. Her hours decrease in the wintertime, and Northeast Safety does not provide Mullen with benefits. CSMF ¶¶ 189, 191. In contrast, when Mullen began working for New Balance they paid her $ 10.60 per hour and scheduled her to work forty hours per week. CSMF ¶ 175. New Balance informed Mullen that her pay would increase to $ 11.10 per hour and then to $ 11.60 per hour. CSMF ¶ 176. New Balance also offered Mullen medical, dental, vision, and life insurance, a 401(k), and short-term and long-term disability benefits. CSMF ¶ 177.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine where a reasonable jury could resolve the point in favor of the non-moving party. *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). A fact is material where it could influence the outcome of the litigation. *Id.* On a motion for summary judgment, courts must construe the record in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).

## DISCUSSION

**I.    The Defendant's Motion for Summary Judgment**

The Defendant argues that the Plaintiff's claims must be dismissed because (i) she does not have a disability under any applicable definition of that term, and therefore cannot establish a prima facie case of discrimination; (ii) she did not request an accommodation, and therefore cannot make out a claim for failure to accommodate under either statute; and (iii) she did not engage in protected conduct, and therefore cannot have been retaliated against for engaging in that conduct. I address each argument in turn.

**A.    Whether New Balance Discriminated Against Mullen on the Basis of Disability**

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12111(2); *id.* § 12112(a). To survive summary judgment on an ADA discrimination claim, a plaintiff must "show that [s]he has a disability within the meaning of the ADA." *Mancini v. City of Providence by & through Lombardi*, 909 F.3d 32, 39 (1st Cir. 2018).

The parties agree that the ADA Amendments Act of 2008 ("**ADAAA**") applies to the Plaintiff's claims. "In the ADAAA, Congress expressly rejected the strict standards imposed on the definition of 'disability' by the Supreme Court and the EEOC . . . by amending the relevant provisions of the ADA to include clarifying details, rules of construction, and examples that underscore the broad applicability of the statute." *Mancini*, 909 F.3d at 40. To that end, the ADAAA asserted that "[t]he

definition of disability . . . shall be construed in favor of broad coverage of individuals . . . , to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

The ADA defines "disability" to include: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). The Plaintiff asserts that she had a disability under the first and the third prongs of this definition. Pl.'s Opp'n 3 (ECF No. 41).

To satisfy the first prong, referred to as "actual disability," a plaintiff must show that her purported impairment impacted a major life activity, "and if so, [that] the impairment substantially limits the major life activity." *Mancini*, 909 F.3d at 40. The ADAAA clarified that the phrase "major life activity" contemplates not only activities like "caring for oneself, performing manual tasks, . . . communicating, and working," but also "the operation of a major bodily function, including but not limited to . . . [the] endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). Similarly, although "the phrase 'substantially limits' was once interpreted strictly, the revised statutory and regulatory framework now provides . . . that 'substantially limits' is not intended to be a 'demanding standard' and should not engender 'extensive analysis.' " *Mancini*, 909 F.3d at 42 (quoting 29 C.F.R. § 1630.2(j)(1)) (citations omitted). Under this updated framework, "a determination as to whether this 'substantially limits' requirement has been satisfied calls for a comparison between the plaintiff's

8

limitations and those of the majority of people in the general population." *Id.* (citing 29 C.F.R. § 1630.2(j)(1)).

The third, "regarded as," prong of the ADA's disability definition aims to "prohibit employers from relying on 'stereotypic assumptions not truly indicative of individual ability.'" *Quiles-Quiles v. Henderson*, 439 F.3d 1, 6 (1st Cir. 2006) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)). Under the ADAAA, a plaintiff may show that she was "regarded as having . . . an impairment" if she "establishes that [] she has been subjected to an action prohibited under [the Act] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).[4] However, a plaintiff cannot rely on the "regarded as" disability definition if their actual or perceived impairment is "transitory and minor." 42 U.S.C. § 12102(3)(B). In this context, a "transitory" impairment is one "with an actual or expected duration of 6 months or less." *Id.*

The Plaintiff argues that she was actually disabled at the time of her termination under several theories, including (i) that her hysterectomy is a physical impairment that limits the major bodily function of reproduction and (ii) that her hysterectomy and oophorectomies are a physical impairment that substantially limits her endocrine function. Alternatively, the Plaintiff argues that after she told

---

[4] This is "substantively broader" than the definition that preceded the ADAAA, because it does not require the plaintiff to show that her impairment substantially limited one or more life activities. *Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016).

9

the Defendant's employees about her hysterectomy and attendant mood issues, they regarded her as mentally or physically impaired.

I find that a dispute of material fact persists regarding whether the Plaintiff was disabled within the meaning of the ADA and its amendments. First, the Plaintiff has presented sufficient facts to allow a jury to decide that she had an actual disability of her reproductive function under § 12102(1)(B). The Defendant admits that reproduction constitutes a major life activity under the ADA and that having a hysterectomy makes reproduction impossible for the patient. Def.'s Mot. 9; CSMF ¶¶ 96-97; *see also* 42 U.S.C. § 12102(2)(B) (listing "reproductive" function as a major bodily function); *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) (reproduction is a "major life activity" substantial impairment of which constitutes a disability). The Defendant also agrees that "without ovaries or a uterus, a woman is substantially limited in the major life activity of reproduction," CSMF ¶ 97—the very definition of a disability under the ADA. *See Yindee v. CCH Inc.*, 458 F.3d 599, 601 (7th Cir. 2006) (sterility that resulted from plaintiff's hysterectomy was "assuredly . . . a 'disability' under the ADA"); *Zemrock v. Yankee Candle Co.*, No. 14-CV-30107-KAR, 2017 WL 506249, at *5 (D. Mass. Feb. 7, 2017) (plaintiff's hysterectomy was a disability because it was a physical impairment that substantially limited the major life activity of reproduction). However, the Defendant claims that Mullen presents an atypical case because she underwent tubal ligation years before her hysterectomy. Def.'s Reply 10 (ECF No. 43). Having elected to eliminate her ability to engage in reproduction, the Defendant argues, the Plaintiff cannot now claim that her hysterectomy substantially

10

limited that activity. Def.'s Reply 10. I disagree. The Plaintiff has testified that before her tubal ligation her doctor told her that the procedure could be reversed, CSMF ¶ 100, and the Defendant concedes that this is a medical option in some circumstances. Def.'s Reply 10. In contrast, a hysterectomy cannot be undone. Ex. 7 at 1. On this basis, a jury could find that the Plaintiff's hysterectomy effected an additional (permanent) impairment on the Plaintiff's reproductive function. *See Murray v. Warren Pumps, LLC*, CIV.A. No. 11-40176-DPW, 2013 WL 5202693, at *8 (D. Mass. Sept. 12, 2013) (denying summary judgment where the plaintiff's purported condition "d[id] not clearly fall outside the range of disability under the ADAAA, and thus [would have] require[d] some significant analysis of what constitutes a disability") *aff'd*, 821 F.3d 77 (1st Cir. 2016).[5]

Second, the Plaintiff has presented sufficient facts to support a finding that she had an actual disability of her endocrine function. The Plaintiff's doctor warned her that her oophorectomy would impact her endocrine system by limiting her ability to produce hormones including estrogen, that after the surgery "she w[ould] be in menopause," and that she would experience symptoms including hot flashes and becoming emotionally overwhelmed. CSMF ¶ 91; Ex. 7 at 1. Moreover, it is

---

[5] The Defendant relies on *Pimental v. Dartmouth-Hitchcock Clinic*, 236 F. Supp. 2d 177 (D.N.H. 2002), to argue that, in order to show that her infertility was a disability under the ADA, the Plaintiff must present evidence that she intended to have children. Def.'s Mot. 10-11 (ECF No. 34). *Pimantel* predates the ADAAA and is unpersuasive given Congress's new directives that (i) impairments to the reproductive *function*—not merely to the "activity" of reproduction—are disabilities within the meaning of the ADA, and (ii) the phrase "substantially limits" is not meant to be a high bar. *See Mancini*, 909 F.3d at 40, 42. *Hartman v. Lafourche Parish Hosp.*, 262 F. Supp. 3d 391 (E.D. La. 2017), *see* Def.'s Mot. 11, is also inapposite, as the court in that case did not address whether the plaintiff's hysterectomy impaired her reproductive or endocrine functions.

undisputed that the Plaintiff was 35 at the time of her surgery and that following the surgery she did, in fact, experience hot flashes and mood swings. CSMF ¶ 94; *see* Ex. 7 at 1. Endocrine function is a "major bodily function" and therefore a "major life activity" under the ADAAA. 42 U.S.C. § 12102(2)(B).[6] A reasonable jury could find that an impairment to the endocrine system sufficient to place the plaintiff abruptly into menopause at the age of 35 constituted a substantial limitation on that system when compared to an average person in the population.[7] *See Hubbard v. Day & Zimmermann Hawthorne Corp.*, No. 3:12-CV-00681-MMD, 2015 WL 1281629, at *4-5 (D. Nev. Mar. 20, 2015) (issue of fact existed as to whether plaintiff had a disability within the meaning of the ADAAA where plaintiff testified that she experienced hormonal imbalance after her hysterectomy "that affects major life activities, including . . . the operation of her endocrine system").

Third, the Plaintiff has presented sufficient evidence to allow a reasonable factfinder to decide that the Defendant's employees regarded her as disabled. Taking the evidence in the light most favorable to the Plaintiff, shortly after Mullen informed

---

[6] The Defendant argues that the Plaintiff had not previously asserted impairment of her endocrine system as a disability, and that this position is therefore waived. I disagree. The Plaintiff's Complaint avers that she had both of her ovaries surgically removed, Compl. ¶ 13, that she thereafter underwent "early menopause," Compl. ¶ 15, and that she was discriminated against in part because of "hot flashes and emotional changes related to her hysterectomy." Compl. ¶ 66. The Plaintiff's original complaint to the Maine Human Rights Commission likewise listed her purported disability as "hysterectomy and early menopause." Ex. B at 1 (ECF No. 39-2). These allegations sufficed to put the Defendant on notice of the Plaintiff's position that her hormone function was substantially limited and that she was discriminated against because of that impairment.

[7] The Defendant cites several cases that have held that "normal symptoms of menopause," in and of themselves, do not constitute a disability and that natural menopause is not a disability per se. *See* Def.'s Mot. 13 (citing cases). But the Plaintiff is not asking me to conclude that menopause is a disability per se.

the Defendant's employees of her hysterectomy and its impact on her emotions, Merry told Mullen that she "d[idn't] think we should have somebody working here that gets that emotional," and pressured Mullen into resigning. *See* CSMF ¶ 145. These facts call into question Merry's after-the-fact assertion that she did not consider Mullen to be impaired, and a jury could conclude based on this evidence that the Defendant regarded Mullen as having a mental or physical impairment.[8] *See Sine v. Rockhill Mennonite Home*, 275 F. Supp. 3d 538, 545 (E.D. Pa. 2017) ("The temporal nexus between Plaintiff's request for leave [to have a hysterectomy] and her termination is sufficient to support the inference that she was regarded as disabled.").[9]

Having found several roads that lead to trial, I will not go down the other paths the Plaintiff has charted. The Defendant offers no other reason that the Plaintiff's disability discrimination claims should not move forward and the Defendant's motion is denied as to those claims.[10]

---

[8] The Defendant suggests that by adopting the Plaintiff's position on this point, I risk paralyzing employers, who will fear a discrimination suit each time they confront an employee about his or her inability to take criticism. The Defendant's concern is disconnected from the facts of this case, in which the Defendant's employees had reason to understand that the Plaintiff's outburst stemmed from something beyond simple distemper.

[9] The Defendant insists that because the Plaintiff told her supervisors that she had undergone a hysterectomy several months before, any perceived disability would be too "transitory" to be the basis of a "regarded as" disability claim. The Defendant's argument fails because it does not account for the fact that Mullen had connected her behavior to a surgery that was inarguably permanent. Further, Mullen told Merry and Fisher that her doctor had told her to expect symptoms to last for years. A reasonable jury could find that the Defendant's employees regarded her as having an impairment that was not transitory. *See* 29 C.F.R. § 1630, App. ("The relevant inquiry is whether the actual or perceived impairment on which the employer's action was based is objectively 'transitory and minor,' not whether the employer claims it subjectively believed the impairment was transitory and minor.").

[10] The Defendant assumes that my analysis of the Plaintiff's claims under the ADA and under the MHRA should be coterminous. *See* Def.'s Mot. 7-8. Because the Defendant offers no additional arguments under the MHRA to support its motion for summary judgment, I have not separately considered the viability of the Plaintiff's claims under that statute.

### B. Whether New Balance Failed to Reasonably Accommodate Mullen's Disability

The ADA requires employers to "mak[e] reasonable accommodations to the known physical or mental limitations" of an employee, unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the" employer's business. 42 U.S.C. § 12112(b)(5)(A). "An employer is obligated to provide a reasonable accommodation . . . where a protected employee has requested an accommodation or the employer otherwise knew that one was needed." *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 84 (1st Cir. 2016). Generally, "the obligation is on the employee to provide sufficient information to put the employer on notice of the need for accommodation," which "means not only notice of a condition, but of a 'causal connection between the major life activity that is limited and the accommodation sought.'" *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012) (quoting B. Lindemann & P. Grossman, *Employment Discrimination Law* ch. 13.VI.D.1, at 880 (4th ed. 2007)). On the other hand, "once the employer becomes aware of the disability of an employee, he is expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability." *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005).

The Defendant claims that the Plaintiff cannot establish a failure-to-accommodate claim because she has not shown that she requested an accommodation or that she linked any such request to the "major life activity" of reproduction. The Defendant's arguments fail. As discussed above, the Plaintiff has raised an issue of fact as to whether her hysterectomy and oophorectomies substantially limited her

endocrine function. In addition, the Plaintiff has testified that she told Merry and Fisher that she had recently had a hysterectomy, that "what comes with having a hysterectomy, is early menopause," and that her doctor had told her she would have hot flashes and become emotional for years after her hysterectomy. Mullen Dep. 78:1-4; 80:20-81:5; *see* CSMF ¶ 126. The Plaintiff has further testified that she "kept telling the HR managers that she just needed to be able to wash her face and go back to work," and that during her conversation with human resources, "I said, if somebody would have just let me go to the bathroom and wipe my face, I would have been fine." CSMF ¶ 130; Mullen Dep. 63:14-20.[11] A reasonable jury could conclude from this evidence that the Plaintiff put the Defendant on notice that she had a disability which had caused her emotional outburst, and that her statements about being allowed to "wash her face and go back to work" were an effort to open a conversation into how to accommodate that disability. *See Erickson v. Bd. of Govs. of Ne. Ill. Univ.*, No. 95 C 2541, 1997 WL 548030, at *6 (N.D. Ill. Sept. 2, 1997) ("[W]hen confronted with [Plaintiff's] insubordinate outburst the University had a responsibility under the ADA to take the small step of sitting down and talking about the situation, assuming the outburst was known to be a product of Plaintiff's disability."). The Defendant's motion for summary judgment on the Plaintiff's failure-to-accommodate claims is denied.

---

[11] While the Defendant's witnesses recall otherwise, on summary judgment I review the facts in the light most favorable to the non-movant. Where there are differing accounts, it is the jury's responsibility to weigh credibility.

### C. Whether New Balance Retaliated Against Mullen

"To succeed on an ADA retaliation claim, a plaintiff must show that the employer retaliated against her because she engaged in protected conduct." *Vélez-Ramírez v. Puerto Rico through Sec'y of Justice*, 827 F.3d 154, 159 (1st Cir. 2016). Requesting an accommodation is protected conduct under the ADA. *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003). The Defendant's sole argument in favor of dismissing the Plaintiff's retaliation claim is that she never requested an accommodation or engaged in any other protected conduct. Because I have found that a question of fact exists as to whether the Plaintiff requested an accommodation, the Defendant's argument fails and its motion for summary judgment on the Plaintiff's retaliation claims is denied.

## II. The Plaintiff's Motion for Partial Summary Judgment

The Plaintiff seeks summary judgment solely on the Defendant's affirmative defense that the Plaintiff failed to mitigate her damages. Where a former employee "has made some effort to secure other employment, the burden to prove failure to mitigate normally resides with the defendant-employer, which then must show that (i) though substantially equivalent jobs were available in the relevant geographic area, (ii) the claimant failed to use reasonable diligence to secure suitable employment." *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999) (citation omitted); *Trainor v. HEI Hosp., LLC*, 699 F.3d 19, 29 (1st Cir. 2012) (same). "The comparability of other jobs turns on numerous factors—e.g.[,] stature, amount of compensation, job responsibilities, and working conditions." *Bennett v. Capitol BC Rests., LLC*, 54 F. Supp. 3d 139, 148 (D. Mass. 2014) (quoting *Lavely v. Trustees of*

*Bos. Univ.*, CIV.A. No. 83-955-G, 1987 WL 17539 (D. Mass. Aug. 28, 1987)); *see also Walmsley v. Brady*, 793 F. Supp. 393, 395 n.1 (D.R.I. 1992) (listing as an additional factor the availability of promotional opportunities). A wrongfully discharged employee need not "go into another line of work, accept a demotion, or take a demeaning position," *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982), and it is "well-established" that he " 'need not accept . . . employment that is located an unreasonable distance from his home.' " *Lavely*, 1987 WL 17539, at *6 (quoting *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 119 (4th Cir. 1983)).

Here, the undisputed facts suggest that the Plaintiff made "some effort" to find additional employment and that after nine months those efforts were successful. CSMF ¶¶ 178-180, 185. Therefore, to establish that the Plaintiff failed to mitigate her damages during that nine-month period, the Defendant must present evidence of the Plaintiff's lack of reasonable diligence and the availability of substantially equivalent jobs in the relevant geographic area.

The Defendant offers as evidence four pages of charts containing employment statistics from the Maine Department of Labor. Based on these charts, the Defendant contends that (i) during 2016, the Central/Western region of Maine in which the Plaintiff resides had 28% of job vacancies in Maine; (ii) 35% of the job vacancies in the Plaintiff's region were in the field of health care and social assistance, (iii) 72% of the vacancies in the Plaintiff's region were in fields with median wages of less than $ 16.43 per hour; and (iv) between 2015 and 2016 the unemployment rate in the Plaintiff's county was in "precipitous decline." Def.'s Opp'n 3. Def.'s Exs. 14-17 (ECF

Nos. 43-1 – 43-4). The Defendant also emphasizes that (i) it took Mullen nine months to find a job despite purportedly applying to every position that she could locate that paid more than ten dollars per hour, (ii) before beginning work at New Balance, Mullen had not been consistently employed since June of 2011, and (iii) Mullen and her boyfriend both began work at Northeast Safety on the same day. Def.'s Opp'n 2.

This proffer satisfies the Defendant's burden by the thinnest of margins. The Defendant's statistical evidence is limited and analysis is lacking. Nevertheless, taking the evidence in the light most favorable to the Defendant, I find that a reasonable jury could conclude from the Defendant's employment statistics that substantially equivalent jobs were available in the Plaintiff's geographic area. Further, while a reasonable jury certainly could decide based on the Plaintiff's testimony about her job search that she mitigated her damages, that jury also could conclude that, in a strengthening economy, the Plaintiff's failure to obtain a job earlier than nine months after she left New Balance—coupled with evidence of Mullen's spotty employment record and the fact that she just happened to begin work on the same day and with the same employer as her boyfriend—suggests that she did not pursue work with reasonable diligence. The Plaintiff's motion for summary judgment is, therefore, denied.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's motion for summary judgment and **DENIES** the Plaintiff's motion for partial summary judgment.

SO ORDERED.

                                                /s/ Nancy Torresen
                                                United States District Judge

Dated this 27th day of February, 2019.